UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ANNIE LIU, | ) |
|---|---|
| Plaintiff, | ) |
| | ) No. 14 C 4993 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, and | ) |
| CLIFFORD ZIMMERMAN, an individual, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Annie Liu, a former law student at Northwestern University School of Law, filed a fifteen-count complaint against Defendants Northwestern University ("Northwestern") and Clifford Zimmerman, the Associate Dean of Northwestern's Law School. She mainly alleges that Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, but she asserts various state law claims as well. Defendants have filed a motion to dismiss [12] with respect to Liu's claims against Northwestern for breach of contract (Count XI), against both Defendants for defamation (Count XIII), against Zimmerman for public disclosure of private facts (Count XIV), and against Northwestern for tortious interference with contractual relations (Count XV). Because Liu has sufficiently alleged a breach of contract claim with respect to the due process procedures set forth in Northwestern's student handbook, that claim may proceed. But because Northwestern was under no obligation to conclude its grievance investigation within a certain time period, Liu's breach of contract claim on that issue is dismissed. Liu's defamation claim is dismissed because Zimmerman's statements in his May 2, 2013 email are nonactionable opinion. Her public disclosure of private facts claim is also dismissed because Liu has not plausibly alleged

that Zimmerman's email disclosed any private facts. Finally, because Liu's relationship with her psychiatrist was terminable at will, her tortious interference claim is dismissed.

## BACKGROUND[1]

### I.  Liu's Endometriosis Diagnosis and Law School Enrollment

While in college, Liu experienced gastrointestinal and rectal pain and chronic fatigue. She had emergency surgery to excise tumors and was diagnosed with stage III/IV endometriosis. Despite her medical issues, Liu completed her coursework with appropriate academic accommodations and graduated from college. She then worked at the Manhattan District Attorney's Office for several years before gaining admission to Northwestern's Law School.

Liu began classes at the Law School in fall 2011. During the spring 2012 semester, Liu provided Northwestern's Office of Services for Students with Disabilities ("SSD") with documentation of her endometriosis, major depressive disorder, and anxiety. The SSD approved certain accommodations, including extended time and an alternative environment for examinations, extended time for in-class written assignments, note-taking services, and flexibility on attendance and academic deadlines. Even with these accommodations, Liu had to take a medical leave of absence for the spring 2012 term. But she was able to serve as a judicial extern on the U.S. Court of Appeals for the Ninth Circuit during the summer of 2012 and returned to the law school for the fall 2012 term, during which she externed on the U.S. Court of Appeals for the Seventh Circuit.

---

[1] The facts in the background section are taken from Liu's complaint and the exhibits attached thereto and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). Where a document is referenced in the complaint and central to Liu's claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.*

## II. Spring 2013 End-of-Semester Issues

During the spring 2013 semester, Liu had to make use of her SSD accommodations. For example, in March 2013, Liu sought treatment at the Northwestern Memorial Hospital Emergency Department for complications arising from her endometriosis. At that time, she requested an extension on a paper from Professor James McMasters. Professor McMasters consulted with Dean Zimmerman, who did not oppose the request, and thereafter granted the extension without requiring documentation.

As the spring 2013 semester neared its end, Liu's troubles with Defendants came to a head. On April 24, 2013, Liu's computer malfunctioned, and she brought it to the Apple store to be examined. When she continued to have computer problems the following day, she returned to the Apple store and was informed the computer needed a new logic board and would be kept overnight. That night, Liu experienced sharp pelvic pain and vaginal bleeding. The next morning, April 26, she scheduled an appointment with Dr. Denise Au, the on-call internal medicine physician at Northwestern Medical Faculty Foundation ("NMFF"), and then met with Dean Zimmerman for a pre-arranged meeting. At that meeting, Liu told Zimmerman about her computer problems and requested a short delay in her exam schedule until she got her computer back. Zimmerman denied Liu's request, maintaining she had to take her first exam on April 29. Liu did not tell Zimmerman that she had vaginal bleeding or that she might be experiencing an endometrial flare, but she did tell him that she was not feeling well and would likely become ill if she had to study all weekend for her exams.

That afternoon, Liu saw Dr. Au, who diagnosed her with an endometrial flare that also triggered her irritable bowel syndrome. Dr. Au wrote a letter detailing Liu's condition and supporting the postponement of Liu's exams. Liu provided this letter to Zimmerman, who

3

agreed to postpone Liu's first exam to May 3, 2013. On April 29, 2013, Liu saw another NMFF physician, Dr. Nancy Dolan, who wrote another letter stating that Liu's condition warranted the postponement of her exams until after Liu's symptoms had completely resolved. Despite Dr. Dolan's letter, Zimmerman sent Liu an email on April 30, copying several others at Northwestern, setting forth a schedule Liu had to meet in order to complete her courses and not receive a failing grade. Liu was to take her first exam on May 3, her other exam on May 7, and complete all other outstanding course work by May 20 at 5:00 p.m. Zimmerman noted that the schedule took into account Liu's representations, medical notes, and existing accommodations, but he also indicated that Liu must not ask for any further extensions on currently scheduled exams or assignments.

On May 2, Zimmerman sent an email regarding Liu to twenty-three Northwestern faculty and staff members, including six deans of the Law School, some of Liu's professors, staff psychologists at Northwestern's counseling office, the Assistant Director of SSD, staff of the Career Strategy Center, Student Services, and Records and Registration, and directors of other academic programs. The email read as follows:

> I am working with a student, Annie Liu, who has been uncooperative, evasive, and not forthcoming in her representations to law school and University personnel. I have given her an exam schedule that she must follow.
>
> I write because she has been actively looking for anyone who will give her a different answer. If she approaches you to meet with someone other than me, you need to direct her to me or to Rob Durr (who is cc'd here). If she asks for an exam accommodation, you need to direct her to me or Rob. If she says it is a medical emergency, you need to tell her to call 911 or go to the emergency room.

Ex. B to Compl. Rob Durr is a staff member of Northwestern's counseling office.

Liu continued to suffer from acute symptoms of endometriosis. She again saw Dr. Dolan on May 2, who found that Liu's condition had not improved. Dr. Dolan wrote another letter recommending that Liu be excused from her exam the following day. Zimmerman reviewed the letter and spoke with Dr. Dolan, but he refused to reschedule Liu's exam and indicated that if she did not take the exam as scheduled, she would receive a failing grade for that course. Liu took the exam the following day despite being in severe pain, and she received her lowest grade ever on a final exam. Liu also completed her other exam as scheduled.

Liu still had to submit her outstanding course work by Zimmerman's deadline of May 20 at 5:00 p.m. Although she had completed her papers by that deadline, she was unable to submit them on time. Liu emailed her professors around 4:30 p.m. on May 20 to let them know that although the papers were completed, she was detained and would not be able to access her computer on which the papers were saved and send them until slightly after 5:00 p.m. Liu volunteered to provide timestamps to demonstrate that the papers had not been modified after the 5:00 p.m. deadline. Although her professors initially agreed, she later received instruction from Zimmerman to email all her papers directly to him by 5:00 p.m. on May 21. Liu was on her way to mandatory training at the U.S. Attorney's Office in New York early on May 21, however, and so by the time she read Zimmerman's email, his deadline had passed. Zimmerman then sent Liu an email on May 23 stating he was giving her failing grades in the three courses for which she had failed to submit papers. He indicated those grades would remain until she submitted her computer for a forensic examination by Northwestern's IT department. When Liu agreed, Zimmerman added the requirement that she also provide medical documents related to her hospitalization in March 2013. Zimmerman also imposed an enrollment hold on Liu's registration at the Law School, keeping her from enrolling courses for the upcoming semester.

On May 30, Liu received a scholarship from the U.S. Attorney's Office, which required her to withdraw from her summer public interest practicum course. Although her professor indicated she could do this without any indication on her transcript, on June 14, Zimmerman informed Liu that he added a "W" to her transcript because she had withdrawn from the course. Zimmerman later informed Liu he did this to pressure her into meeting with him and producing the requested medical records. Liu sought counsel from others at the University, including Daniel Rodriguez, the Dean of the Law School, but they were not helpful. Zimmerman sent an email to Liu advising her to stop seeking counsel from others at the University, as did Dean Rodriguez. Liu then met with Zimmerman and Professor Maureen Stratton on July 15 and 16 and produced medical and computer records, as Zimmerman had requested. She sought to have legal counsel or a representative from SSD present at the meeting, a request Zimmerman refused. Liu allowed Northwestern Law School's IT staff to examine her computer for the limited purpose of determining the timestamps for the three papers she had not submitted on May 20, which were located in a separate folder on her computer. Instead of restricting their inspection to this folder, however, the IT staff conducted a global search of Liu's computer, which Liu demanded be stopped. Zimmerman required Liu to reveal the U.S. Attorney's Office policies on access to files stored on its computer network and ordered Liu to contact the U.S. Attorney's Office's IT department during the meeting. After the meeting, Zimmerman allowed some of Liu's papers to be graded, but Liu still has not received a professor-issued grade in at least two of her courses and has a failing grade in one course. Zimmerman also did not remove the hold on her enrollment.

### III. Leave of Absence

On August 9, Liu wrote to Zimmerman to request permission to take a leave of absence. She also informed him that she would be filing a formal grievance with Northwestern. On August 12, Zimmerman responded that to return from a leave of absence, Liu would have to do the following: (1) submit hospital records to substantiate her overnight stay in the hospital on March 3 to 5 and March 6 to 7, 2013; (2) produce documents to verify her computer crashed on April 1 and 25, 2013; and (3) allow the Law School's IT department to speak directly with the U.S. Attorney's Office staff to clarify the U.S. Attorney's Office's encryption practices. Zimmerman also suggested that Liu had violated Northwestern's Code of Conduct by providing false information to Northwestern officials and failing to cooperate with Northwestern officials. On August 22, 2013, Liu submitted her leave of absence form, marking "other" as the reason for her leave. She also delivered additional documentation that she had been in the emergency room in March and that she had computer difficulties on March 29 and April 24 and 25. On August 26, Zimmerman informed Liu that the hospital documents were not sufficient and requested a medical release so that he could speak directly with hospital personnel to verify her stay. Liu refused to sign such a release.

Zimmerman agreed to Liu's requested leave of absence, modifying it to impose certain "academic conditions" for her return as well as indicating that the requested leave was, in part, for medical reasons. Ex. D to Compl. Those conditions were: (1) that Liu provide Zimmerman with the name of someone at Northwestern Memorial Hospital to verify the documents she submitted regarding her hospital stay in March 2013 and a release for Zimmerman to speak with that person; (2) that Liu provide additional documentation regarding her computer failure in April 2013; and (3) that Liu provide additional information regarding the encrypted status of her

7

computer files so as to verify the file properties of the paper she sought to submit in her conflict management class.

In November 2013, Liu informed Zimmerman of her intent to return to the Law School. Zimmerman, however, denied her request to return, maintaining that she had not complied with the academic conditions he had set forth. He also maintained that because her leave of absence was in part for medical reasons, she was required to obtain medical clearance for her return. Instead of remaining in Chicago, Liu returned home to California, where she remains.

## IV. Liu's Internal Grievance

On September 6, Liu filed a grievance with Northwestern's Office of Equal Opportunity Access (the "OEOA"), alleging Zimmerman discriminated against her based on her disability and gender and that he failed to follow Northwestern's rules and procedures. Liu was interviewed by the OEOA and provided a list of potential witnesses to support her case. The OEOA's grievance procedures provide that "[i]nvestigations will be conducted as expeditiously as possible and are usually completed within 30-60 days, though this may vary based on the availability of witnesses, the scope of investigation, or unforeseen circumstances." Compl. ¶ 189 (alteration in original). The OEOA issued its finding on August 13, 2014.

## V. Liu's Relationship with Meridian Psychiatric Partners

In early May 2013, Zimmerman or some other Northwestern Law School representative contacted Dr. Flavio Arana, a psychiatrist at Meridian Psychiatric Partners, LLC, whom Liu was seeing while her private psychiatrist, Dr. Elise Rehn, was on maternity leave. Dr. Arana was informed that Liu was not completing her work, that she was attributing her failure to finish her work to her depression, and that Liu had an emergency appointment with Northwestern's counseling office. In late August 2013, Liu attempted to schedule an appointment with Dr.

8

Rehn, who by then had returned from maternity leave. But Liu was told in a voicemail message that Dr. Rehn was terminating their physician-patient relationship. Liu attempted to contact Dr. Rehn again, but she refused to communicate further with Liu.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Breach of Contract (Count XI)

Liu alleges that Northwestern breached its contract with Liu by failing to afford her the due process procedures set forth in its student handbook for suspected violations of academic integrity and violations of the student code of conduct. She also contends that Northwestern breached its contract by failing to promptly investigate or resolve the grievance she filed with the OEOA. Northwestern does not dispute that an implied contract can arise out of its student handbook, *see Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012)

9

(assuming that plaintiff pleaded the existence of an implied contract arising out of university's student handbook and codes of conduct), but contends that Liu has not adequately alleged that any applicable procedures have been breached.

Initially, the Court clarifies that the fact that Liu did not attach to the complaint a copy of all documents that form the basis of her breach of contract claim does not warrant dismissal of that claim, as Northwestern argues. Although 735 Ill. Comp. Stat 5/2-606 requires a plaintiff proceeding on a claim based on a written instrument to attach that writing to the pleading, the rule is a procedural one that does not apply in federal court. *Mitchell v. United Med. Sys., Inc.*, No. 10 C 6273, 2011 WL 1526985, at *5 (N.D. Ill. Apr. 20, 2011). The Federal Rules of Civil Procedure do not require a plaintiff to attach the contract on which a breach of contract claim is based to her complaint, and so Liu's attachment of only a portion of the student handbook does not automatically warrant dismissal of her claim. *Arnold v. Janssen Pharmaceutica, Inc.*, 215 F. Supp. 2d 951, 962 (N.D. Ill. 2002) ("[F]ederal courts, unlike Illinois state courts, do not require that critical documents be attached to the complaint."). Northwestern also briefly argues that Liu has not alleged damages or that any breach proximately caused her damages, but these arguments are similarly meritless and do not deserve further consideration, as Liu has throughout her complaint set forth the harm she alleges she suffered as a result of Northwestern's failure to abide by its policies: the inability to continue in her studies at Northwestern or at a comparable law school and the attendant difficulties that have arisen as a result.

Moving to the substance of Liu's claim, Liu first relies on a portion of the 2012-2013 Northwestern student handbook that provides that, "[i]n all cases involving allegations of a violation of the standards of academic integrity, the student charged or suspected shall, at a minimum, be accorded" certain rights as set forth in the handbook. Ex. E to Compl. She

10

acknowledges that she was never formally charged with a violation of academic integrity but contends that she nonetheless was entitled to the rights set forth in the handbook because she was at a minimum suspected of a violation or *de facto* charged with violations. She claims these suspicions or *de facto* charges are evidenced by, among other things, Zimmerman placing a hold on her registration and enrollment, imposing failing grades on her transcript, and imposing "academic conditions" on her return from her leave of absence that require explanations regarding her alleged lack of academic integrity. Northwestern responds that because Liu has never been formally charged with a violation of Northwestern's standards of academic integrity, the due process requirements set forth in the handbook do not apply and there can be no breach. But because the Court must at this stage take Liu's allegations as true and draw all inferences in her favor, and the language in the student handbook on which Liu relies is not precise but rather could lend itself to Liu's interpretation, the Court cannot definitively find Liu was not entitled to additional protections.[2]

Liu also contends that Northwestern breached its contract by failing to promptly investigate or resolve Liu's discrimination grievance as required by its policies. As set forth in her complaint, Northwestern's OEOA grievance procedures provide that "[i]nvestigations will be conducted as expeditiously as possible and are usually completed within 30-60 days, though this may vary based on the availability of witnesses, the scope of investigation, or unforeseen circumstances." Compl. ¶ 189 (alteration in original). Liu alleges that Northwestern failed to follow this procedure by taking over nine months to investigate her grievance. But the Court

---

[2] Northwestern also raises the argument in reply that Liu's breach of contract claim fails because she relies on Northwestern's generic student handbook instead of the more specific Law School Honor Code, which Defendants attached to their reply but is not mentioned in Liu's complaint. Because this argument was only raised in reply, and Liu has not had an opportunity to respond to it, the Court has not considered it but instead has focused only on whether Liu has stated a claim for breach of contract with respect to procedures contained in the student handbook. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

agrees with Northwestern that this section of Northwestern's OEOA grievance procedure does not provide Liu with an enforceable right on which to sue, for it does not set forth a definite standard by which Northwestern agreed to abide but rather only sets forth Northwestern's intention to complete its investigations in an expeditious manner. *See Abrams v. Illinois Coll. of Podiatric Med.*, 395 N.E.2d 1061, 1065, 77 Ill. App. 471, 32 Ill. Dec. 680 (1979) (provision in student handbook providing that "[i]t is desirable that the instructor should periodically inform the student of his progress" and should do so "soon after mid-term examinations" was "an expression by the College of an unenforceable expectation which plaintiff did not have the power to transform into a binding contractual obligation"). The phrasing indicates that Northwestern expects that some investigations, such as Liu's, will not be completed within 30 to 60 days, and is not definite enough to obligate Northwestern in the event that "unforeseen circumstances" arise or the "scope of the investigation" changes that prolong the investigation. Thus, Liu cannot proceed on her breach of contract claim with respect to the length of time involved in investigating her grievance.

Finally, a student's breach of contract claim against a private university is treated somewhat differently from a typical breach of contract claim, with Liu required to allege not only a breach but also that Northwestern's conduct was arbitrary, capricious, or in bad faith. *Seitz-Partridge v. Loyola Univ. of Chicago*, 948 N.E.2d 219, 226, 409 Ill. App. 3d 76, 350 Ill. Dec. 150 (2011); *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699, 346 Ill. App. 3d 728, 282 Ill. Dec. 77 (2004) ("[I]n the student-university context, a student may have a remedy for breach of contract when it is alleged an adverse academic decision has been made concerning the student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*."). Generally, "a court may not override the academic decision of a university 'unless it is such a substantial

departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Raethz*, 805 N.E.2d at 699 (quoting *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985)). Northwestern argues that Liu has not alleged facts to support her conclusory assertion that Northwestern's failure to abide by the student handbook was arbitrary and capricious. Taking the entirety of Liu's allegations as true, however, Liu has sufficiently alleged that Northwestern departed from accepted academic norms in its treatment of her by placing unreasonable "academic conditions" on her return from a leave of absence that amount to charges of academic dishonesty without allowing her access to the procedures set forth in the student handbook to challenge such charges. Thus, the Court will allow Liu to proceed on her remaining breach of contract claim. *See O'Driscoll v. Argosy Univ.*, No. 12 C 10164, 2014 WL 714023, at *2–3 (N.D. Ill. Feb. 25, 2014) (allowing breach of contract claim to proceed against university where plaintiff had alleged that she had been retaliated against for reporting inappropriate conduct and that she had been terminated from her academic program based on false statements made by her advisor).

## II. Defamation (Count XIII)

In order to state a defamation claim, Liu must allege that (1) Zimmerman made a false statement about Liu, (2) Zimmerman made an unprivileged publication of the statement to a third party, and (3) the publication of the statement caused damage to Liu. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839, 221 Ill. 2d 558, 304 Ill. Dec. 369 (2006). Several categories of statements are considered defamatory *per se*, including, as relevant here, "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties" and "words that impute a person lacks ability or otherwise prejudices that person in her

13

or his profession." *Id.* If a statement is defamatory *per se*, damages are presumed, but if a statement is not defamatory *per se*, Liu may still recover for defamation *per quod* but must plead "extrinsic facts to demonstrate that the statement has a defamatory meaning" and "that she sustained actual damage of a pecuniary nature." *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214, 174 Ill. 2d 77, 220 Ill. Dec. 195 (1996).

Liu claims that Zimmerman made the following defamatory statements in his May 2, 2013 email: (1) Liu "has been uncooperative, evasive, and not forthcoming in her representations to law school and University personnel;" and (2) "I have given her an exam schedule that she must follow . . . she has been actively looking for anyone who will give her a different answer." Compl. ¶ 96. Liu contends that these statements are capable of only one construction, namely that she is a liar and fabricated symptoms of her endometriosis in an attempt to obtain unwarranted extensions of her exam schedule. Defendants respond that Zimmerman's statements are not actionable because they are protected expressions of opinion or otherwise capable of innocent construction. They also argue that Liu cannot recover for defamation *per se* because she does not belong to the legal profession and the comments do not relate to her status as an employee. Defendants further contend that Liu has failed to adequately plead a claim for defamation *per quod* because she has not alleged extrinsic facts to show how the statements are defamatory nor has she alleged special damages.

A statement is not actionable if it involves an assertion of an opinion and not a fact. *Moriarty v. Greene*, 732 N.E.2d 730, 740–41, 315 Ill. App. 3d 225, 247 Ill. Dec. 675 (2000). This applies both to defamation *per se* and *per quod* claims. *Id.*; *see also Huon v. Breaking Media, LLC*, --- F. Supp. 3d ----, 2014 WL 6845866, at *13 n.26 (N.D. Ill. Dec. 4, 2014) (noting that defamation *per quod* claims would fail to the extent statements were found to be opinion

14

under defamation *per se* analysis); *Artunduaga v. Univ. of Chicago Med. Ctr.*, No. 12 C 8733, 2013 WL 2151685, at *3 (N.D. Ill. May 16, 2013) ("[T]he overarching problem with Plaintiff's defamation claims, both *per se* and *per quod*, is that the statements, while perhaps defamatory, are nevertheless non-actionable statements of opinion."). Whether a statement is one of opinion or fact is a question of law. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). In determining whether the statement presents a fact or an opinion, the Court considers (1) whether the words have a precise and readily understood meaning, (2) whether the context negates the impression that the speaker intended to convey a fact, and (3) whether the statement can be objectively verified. *Hadley v. Doe*, 12 N.E.3d 75, 87, 2014 IL App (2d) 130489, 382 Ill. Dec. 75 (2014).

Determining whether a statement is fact or opinion often depends on whether the appropriate factual context is provided. For example, in *Schivarelli v. CBS, Inc.*, the plaintiff claimed that defendant's statement in a 30 second promotional advertisement that the plaintiff was "cheating the city" was defamatory. 776 N.E.2d 693, 697, 333 Ill. App. 3d 755, 267 Ill. Dec. 321 (2002). But the court found that the statement was not actionable because it lacked factual context. *Id.* at 699 ("Ms. Zekman did not explain the evidence that she was referring to, nor did she state why she thought Mr. Schivarelli was cheating the city, how he was cheating the city, or even what she meant by the term 'cheating.'"). Similarly, in *Dubinsky v. United Airlines Master Executive Council*, the statement that the plaintiff was a "crook" was not actionable because it was a general statement made without factual context and it could not be assumed that all who heard the statement were aware of the context behind it. 708 N.E.2d 441, 451, 303 Ill. App. 3d 317, 236 Ill. Dec. 855 (1999) ("[T]his general statement, in the absence of factual context, is a statement of opinion, not objectively verifiable and devoid of factual content.").

15

And in *Hopewell v. Vitullo*, the court found the phrase "fired because of incompetence" to be nonactionable opinion because it was "too broad, conclusory, and subjective to be objectively verifiable." 701 N.E.2d 99, 104, 299 Ill. App. 3d 513, 233 Ill. Dec. 456 (1998). The court noted that "[a]lthough the public might infer undisclosed and unassumed facts that support [the defendant's] opinion, the statement is so ambiguous and indefinite that any inferable facts flow from numerous possible facts that might conceivably support the conclusion that [plaintiff] was 'incompetent." *Id.* By contrast, courts have found statements actionable where a factual basis has been provided for the statement. *See, e.g.*, *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-06500, 2014 WL 4269126, at *13 (N.D. Ill. Aug. 28, 2014) (distinguishing *Hopewell* and finding that a statement that plaintiff was a poor candidate was linked to his test scores, "provid[ing] the context and factual basis missing in *Hopewell*"); *Solaia*, 852 N.E.2d at 841 (statement in letter that patent was "essentially worthless" was actionable when read in context because the letter "not only places a value on the patent, but bases this value on an informed reading of the patent by the industry veteran"); *Kumaran v. Brotman*, 617 N.E.2d 191, 195, 200, 247 Ill. App. 3d 216, 186 Ill. Dec. 952 (1993) (defendant accused plaintiff of "working a scam" by filing "unwarranted suits for settlement money," which "concerned plaintiff's conduct and his character" and "suggests that [the article] was factual").

Here, Zimmerman's allegedly defamatory statements are like those found not to be actionable because they cannot be objectively verified. Although Liu contends that the statements suggest that she was lying regarding her need for accommodations and her medical condition, any factual context for the link Liu draws is missing. Liu's medical condition was not mentioned in the email, nor was the fact that she was entitled to or needed accommodations. Like in *Schivarelli*, Zimmerman did not explain the basis for his opinion that Liu was being

16

uncooperative, evasive, and not forthcoming.  *See Schivarelli*, 776 N.E.2d at 699.  Although Zimmerman mentioned that Liu must follow the exam schedule he had given her, it is not clear that the allegedly evasive and not forthcoming representations were tied specifically to the exam schedule, and thus an attempt to prove or disprove Zimmerman's statement could entail an "endless analysis of each and every fact connected with" Liu's statements to Zimmerman and other Northwestern personnel.  *Hopewell*, 701 N.E.2d at 104.  Thus, without more, Zimmerman's statements that Liu was being "uncooperative, evasive, and not forthcoming" and "actively looking for anyone who will give her a different answer" are merely opinions that cannot be objectively verified.  Liu's defamation claim is dismissed.

### III.    Public Disclosure of Private Facts (Count XIV)

In order to state a claim for public disclosure of private facts, Liu must allege "(1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person." *Johnson v. Kmart Corp.*, 723 N.E.2d 1192, 1197, 311 Ill. App. 3d 573, 243 Ill. Dec. 591 (2000). Liu contends that Zimmerman's May 2, 2013 email disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Illinois Mental Health and Developmental Disabilities Confidentiality Act ("Illinois Mental Health Act"). Specifically, she contends that the email disclosed that she had a medical condition for which she was seeking academic accommodations.  Zimmerman's email did not state that Liu was suffering from endometriosis or that she had obtained certain accommodations from the SSD.  Nor does Liu suggest any other basis by which information protected by HIPAA or the Illinois Mental Health Act was disclosed in the email.  Rob Durr's role was left unstated and his mention cannot be plausibly construed to suggest that Liu had medical conditions requiring psychiatric attention.

17

And although the email did suggest that Liu was seeking exam accommodations, the reason for those accommodations was left unsaid. Nor can Zimmerman's suggestion as to what should be done if Liu told one of the recipients of the email that she was suffering from a medical emergency be read as disclosing that Liu suffers from endometriosis, for the suggestion in and of itself did not disclose any information regarding Liu's protected information. Thus, because Liu has not plausibly alleged that the email disclosed private facts, Liu's public disclosure of private facts claim is dismissed.

## IV.     Tortious Interference with Contract (Count XV)

Finally, Liu alleges that Northwestern tortiously interfered with the contractual relationship she had with her private psychiatrist, Dr. Rehn. To state a claim for tortious interference with contract, Liu must allege (1) the existence of a valid and enforceable contract between Liu and Dr. Rehn; (2) Northwestern's awareness of the contract; (3) Northwestern's intentional and unjustified inducement of a breach of the contract; (4) Dr. Rehn's breach of the contract, caused by Northwestern's conduct; and (5) damages. *Dopkeen v. Whitaker*, 926 N.E.2d 794, 797, 399 Ill. App. 3d 682, 339 Ill. Dec. 319 (2010). Northwestern argues that Liu's claim should be dismissed with prejudice because Liu cannot recover for tortious interference with a physician-patient relationship.

Illinois considers the physician-patient relationship to be terminable at will. *Olaf v. Christie Clinic Ass'n*, 558 N.E.2d 610, 614, 200 Ill. App. 3d 191, 146 Ill. Dec. 647 (1990) ("Unlike the right to receive benefits of a contract, the right to engage in a physician-patient relationship is not absolute but is instead terminable at will."). Although Liu contends that the psychiatrist-patient relationship deserves greater protection than the typical physician-patient relationship, she cites no Illinois case—and the Court has been unable to find any—that suggests

18

that the psychiatrist-patient relationship may not be terminated at will. The ethical standards Liu cites do not change this conclusion.

Because the physician-patient relationship is terminable at will, a plaintiff cannot state a claim for tortious interference with contract for the alleged inducement of the termination of such a relationship. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Humana Ins. Co.*, No. 11 C 6837, 2012 WL 473133, at *2–3 (N.D. Ill. Feb. 8, 2012) (dismissing tortious interference with contract claim where doctor alleged insurance company induced cancellation of contracts with patients that were terminable at will); *Olaf*, 558 N.E.2d at 614 (affirming judgment for defendants on tortious interference with contract claim where doctor did not have enforceable contract with his patients). "Under Illinois law, a defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (alteration omitted) (internal quotation marks omitted) (citation omitted). But here, Liu has not pleaded tortious interference with prospective economic advantage. Because Illinois law precludes her from recovering on a tortious interference with contract theory, that claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss [12] is granted in part and denied in part. Count XI is dismissed with prejudice with respect to Northwestern's failure to promptly investigate and resolve Liu's grievance. Counts XIII and XV are dismissed with prejudice. Count XIV is dismissed without prejudice. Defendants are given until February 2, 2015 to answer the remaining allegations of the complaint.

Dated: January 26, 2015

SARA L. ELLIS
United States District Judge