**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**
\* \* \*

| | |
|---|---|
| ANNIE LIU, )<br><br>Plaintiff, )<br>v. )<br><br>NORTHWESTERN UNIVERSITY, )<br>and CLIFFORD ZIMMERMAN, )<br>an individual, )<br><br>Defendants. )<br>—————————————————) | Case No.: 14 CV 04993 |

**<u>1st AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, Annie Liu, by and through her attorneys, Jill Calian and Rachael Gross of Calian &

Gross, LLP, hereby complains and alleges against Defendants, Northwestern University, and

Clifford Zimmerman as follows:

**<u>INTRODUCTION</u>**

This is a Complaint for Damages and Injunctive Relief brought by a law student of

Northwestern University School of Law. Plaintiff has a disability that entitles her to certain

academic accommodations. After Plaintiff requested such accommodations, Clifford

Zimmerman, Associate Dean of the Law School, unilaterally determined that she was fabricating

her disability to gain unfair advantage. The Dean took various coercive and adverse actions

against Plaintiff that culminated in her being constructively expelled from the Law School. This

matrix of facts gave rise to the instant complaint. The federal claims against Northwestern

University are based upon Section 504 of the Rehabilitation Act of 1973 and Title III of the

Americans with Disabilities Act. Plaintiff also asserts various state claims against both

1

Northwestern University and Dean Clifford Zimmerman for breach of contract and against Dean Zimmerman for intentional infliction of emotional distress.

## Jurisdiction

1.      This court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. 1331 (federal question).

2.      Supplemental jurisdiction over Plaintiff's pendent state law claim rests upon 28 U.S.C. 1367, since the claim arises out of the same transaction and occurrence as Plaintiff's federal claims.

## Venue

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. 1391(b) because violations of the above referenced laws have taken place and continue to take place in the Northern District of Illinois and Defendants are located in this district.

## Parties

4.      Plaintiff, Annie Liu, at all relevant times was a resident of the State of Illinois and a student at the Northwestern University School of Law ("the Law School"), a school of Northwestern University, a private university.

5.      Plaintiff is a qualified individual with a disability, as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(20) ("Section 504") and Title III of the Americans with Disabilities Act, 42 U.S.C. 12131(2) (the "ADA").

6.      Defendant, Northwestern University ("the University"), is an institution of higher education duly organized and existing under the laws of the State of Illinois as an Illinois not-for-profit corporation.  The University receives federal financial assistance, as defined by Section 504, 29 U.S.C. 794.

7.      The University, as an undergraduate and postgraduate private school, is a "place of public accommodation," as defined by 42 U.S.C. 12181(7)(j) and is therefore covered by the ADA.

8.      Defendant, Clifford Zimmerman ("the Dean"), at all times relevant was the Associate Dean/Dean of Students for the Law School.  He is named in this complaint in both his individual and official capacity.

9.      At all times relevant, Defendants' actions took place in the State of Illinois.

10.      Defendants committed the acts and omissions alleged in this complaint in bad faith and with knowledge that their conduct violated established and settled law.

## General Factual Allegations

11.      Plaintiff, Annie Liu, the daughter of first-generation immigrants, grew up poor in a drug and crime-ridden community in southern California.  Plaintiff, along with her older brother, is the first in her family to earn a college degree.

12.      Despite these humble beginnings, Plaintiff was admitted to Harvard University on a full scholarship.

13.      In the fall of 2002, during her freshman year at Harvard, Plaintiff began experiencing symptoms of endometriosis.

14.      Endometriosis, an incurable disease of unknown cause, occurs when endometrial tissue, normally found inside the uterus, grows outside a woman's uterus, adhering to surrounding reproductive organs and gastrointestinal parts. Endometriosis produces cysts, adhesions, and scar tissues that can interfere with organ functions and cause serious internal inflammations.  The primary symptoms of endometriosis are chronic pelvic pain (sometimes

severe and often worsening during a woman's menstruation) in the abdomen and pelvis, gastro-intestinal complications, and infertility.

15.     While a student at Harvard, Plaintiff underwent emergency surgery to excise two large tumors (endometriomas), remove scar tissue, and repair organ damage caused by extensive growths of endometrial implants and adhesions that had bound Plaintiff's pelvic and gastrointestinal organs to each other and to the walls of Plaintiff's pelvis and abdomen. Following surgery, Plaintiff was medically diagnosed with Stage III/IV endometriosis.

16.     Excision surgery is an effective but temporary treatment. Plaintiff continues to suffer from debilitating gastrointestinal and rectal pain, diarrhea, intermittent bleeding, and chronic fatigue – consistent with the incurable nature of this disease.

17.     Plaintiff's impairment substantially limits one or more of her major life activities, including her ability to concentrate, learn, and think.

18.     At times, Plaintiff's pain is such that she becomes incapacitated, unable to perform functions of daily living, and must be confined to bed. Plaintiff's impairment likewise interferes with major bodily functions, including her reproductive and digestive systems.

19.     Despite her disability, Plaintiff was determined not to let it diminish her aspirations. With appropriate academic accommodations, Plaintiff excelled at Harvard, earning both good grades and accolades for her community service. Plaintiff worked up to twenty-five hours per week, volunteered extensively, and served as the Director of a non-profit program for at-risk youth in Boston's Chinatown. Plaintiff was twice awarded scholarships for her outstanding contributions in public service, leadership, and advocacy.

20.     Plaintiff graduated from Harvard in November 2007 with a cumulative grade point average of 3.39.

4

21.     After graduation, Plaintiff worked with the Manhattan District Attorney's Office to help spearhead the creation of a criminal intelligence unit alongside an innovative intelligence-driven prosecution model.

22.     In December 2010, Plaintiff applied for admission to the Law School.

23.     In her application, Plaintiff disclosed that she had been diagnosed with a severe form of endometriosis.

24.     Plaintiff was admitted to the Law School and enrolled in the fall of 2011.

25.     In the spring of 2012, Plaintiff provided documentation of her disability and the resultant functional limitations to the University's office of Services for Students with Disabilities ("SSD").

26.     Plaintiff's supporting documentation included a diagnosis of endometriosis, as well as major depressive disorder and anxiety, common co-morbid conditions of endometriosis. Notably, high levels of stress have been found to worsen the symptoms of endometriosis and cause the disease to progress.

27.     The SSD approved accommodations to facilitate Plaintiff's equal access to the University's programs and resources.

28.     The SSD-approved accommodations included: alternative-testing conditions (double time, reduced distraction environment), extended time for in-class written assignments, note-taking services, and flexibility on attendance and academic deadlines.

29.     Plaintiff's anxiety disorder, a co-morbid condition of her endometriosis, compelled her to take a medical leave of absence from the Law School for the spring term of 2012.

30. During the summer of 2012, Plaintiff served as a judicial extern on the United States Court of Appeals for the Ninth Circuit.

31. She returned to the Law School in the fall of 2012.

32. During the fall term of 2012, Plaintiff served as a judicial extern on the United States Court of Appeals for the Seventh Circuit.

33. During the spring term of 2013, Plaintiff interned for the Financial Industry Regulatory Authority (FINRA), the largest independent securities regulator in the United States.

34. Plaintiff's endometriosis required her to use her SSD-approved accommodations during her second year of law school.

35. On April 24, 2013, Plaintiff's Apple® computer malfunctioned. Plaintiff brought her computer into the Genius Bar at an Apple Retail Store. When the computer continued to malfunction the next day, Plaintiff returned to the Apple Store and was informed that her computer needed a new logic board and would be kept overnight for repairs.

36. Coincidentally, during the night of April 25, 2013, Plaintiff experienced sharp pelvic pain and discovered that she had unexpectedly begun vaginal bleeding.

37. Plaintiff, worried that she was experiencing the beginning of an endometrial flare, phoned Northwestern Medical Faculty Foundation ("NMFF") early the next morning to schedule a same-day appointment with Dr. Denise Au ("Dr. Au"), the on-call internal medicine physician.

38. Also, in the morning of April 26, 2013, Plaintiff emailed the Dean to inform him of her computer malfunction and to confirm a pre-arranged meeting with him for later that morning.

39.     Plaintiff met with the Dean in the morning of April 26th.  She told the Dean about her computer crash and requested a short delay in her exam schedule while her computer, on which her exam and study materials were stored, remained at the Apple Store.

40.     The Dean denied the postponement.

41.     Plaintiff accepted the Dean's decision.

42.     While meeting with the Dean on the morning of April 26th, Plaintiff did not tell him that she had begun bleeding vaginally.

43.     Plaintiff did not disclose that she might be experiencing an endometrial flare.

44.     Plaintiff wanted to confirm her condition with her physician before sharing these intimate details with the Dean.

45.     During the morning meeting, Plaintiff did tell the Dean that she was not feeling well and that she would likely become more ill if she had to study around the clock all weekend.

46.     In the afternoon of April 26th , Plaintiff went to her pre-arranged appointment with Dr. Au.

47.     Based on her medical exam of Plaintiff, Dr. Au diagnosed her with an endometrial flare that also triggered Plaintiff's irritable bowel syndrome.

48.     Dr. Au wrote a letter detailing Plaintiff's deteriorated health and supporting postponement of Plaintiff's upcoming law school exams.

49.     Plaintiff gave Dr. Au's letter to the Dean.

50.     The Dean begrudgingly agreed to postpone Plaintiff's Monday exam.  He set a modified exam schedule wherein Plaintiff was required to take her first exam on Friday, May 3, 2013, the last expected day of Plaintiff's menstrual period.

51.    The Dean predicated this deferment on Plaintiff's commitment to complete other work during the time that she would have been studying for her Monday exam.

52.    On Monday, April 29, 2013, Plaintiff was still very ill.  She again visited NMFF's medical clinic where she submitted to pelvic examination, this time by Dr. Nancy Dolan ("Dr. Dolan"), the internal medicine physician on-call that day.

53.    Dr. Dolan concluded that Plaintiff was still suffering from her endometriosis flare and irritable bowel syndrome, which were causing Plaintiff severe abdominal and pelvic pain, nausea, vomiting, diarrhea, and fatigue.

54.    In a letter dated April 29, 2013, Dr. Dolan opined that Plaintiff's debilitating condition warranted a postponement of her exams until after her symptoms had resolved.

55.    The next day, notwithstanding the medical diagnoses of the two NMFF physicians, the Dean sent an email to Plaintiff, carbon-copied to several other staff members, accusing Plaintiff of trying to deceive and manipulate him and the University by falsifying her illness to procure a postponement of exams.  (See Dean's April 30th email, Exhibit A.)

56.    The Dean premised his accusation on Plaintiff's failure to tell him during their meeting on the morning of April 26th that Plaintiff had started her menses and was anticipating an endometrial flare.

57.    In his April 30, 2013 email, the Dean also expressly forbade Plaintiff from requesting further extensions on any currently scheduled exams or assignments.

58.    Plaintiff responded, explaining to the Dean that she had not alerted him to her menstrual bleeding because "[i]t is extremely uncomfortable for me to share private, personal, and intimate information about my menstruation cycle with people outside my family. And it is especially difficult to keep sharing this information with someone who appears to believe that the

8

pain I'm experiencing as a result of a documented, physical medical condition are made up to cover a computer failure."

59.     On Wednesday, May 1, 2013, the Dean spoke with Dr. Dolan ostensibly to divine her expert opinion about Plaintiff's current medical condition.

60.     Instead, in his conversation with Dr. Dolan, the Dean attempted to persuade Dr. Dolan that Plaintiff was contriving her illness.

61.     The Dean advised Dr. Dolan that (1) Plaintiff had requested an extension because her computer had crashed and that, when he denied her request, she had threatened to make herself ill; (2) Plaintiff did not disclose that she was suffering from symptoms of endometriosis when she met with him on the morning of April 26th; and (3) Plaintiff had sought counseling with the University's Office of Counseling and Psychological Services (the "Counseling Office").

62.     On May 2, 2013, the Dean sent an email (the "May 2nd email") to twenty-three (23) faculty and administrative staff members from the Law School and the University, including without limitation, six (6) deans of the Law School, a number of Plaintiff's law professors, the Associate Director and staff psychologists of the University's Counseling Office, the Assistant Director of the University's SSD Office, the Associate Director and staff of the Career Strategy Center, the Director and staff of Student Services, the Director and staff of Records and Registration and the directors of various academic programs.  (See Dean's May 2nd email, Exhibit B.)

63.     Many of the recipients of the May 2nd email were unknown to Plaintiff.

64.     In the May 2nd email that he sent to twenty-three faculty and administrators of the Law School and University, the Dean branded Plaintiff as "uncooperative, evasive and not forthcoming in her representations to the law school and University personnel."

65.     The May 2nd email further stated that although the Dean had given Plaintiff an exam schedule, "she has been actively looking for anyone who will give her a different answer."

66.     The Dean instructed all recipients, that if Plaintiff approached them, they should direct her to the Dean or to Rob Durr (from the University's Counseling Office).

67.     The Dean added that if Plaintiff were to say she is experiencing a medical emergency, they should "tell her to call 911 or go to the emergency room."

68.     Plaintiff did not learn of the May 2nd email blast until some time in August 2013.

69.     Later in the day on May 2, 2013, Plaintiff, still experiencing acute symptoms of her endometriosis, again visited Dr. Dolan. After conducting still another thorough pelvic exam, Dr. Dolan found that Plaintiff's condition had not improved.  She drafted another letter recommending that, given Plaintiff's symptoms and the effects of her treatment, Plaintiff be excused from her Friday, May 3rd exam if she were not feeling better the next day.

70.     The Dean received this letter and again spoke with Dr. Dolan.

71.     The Dean rejected Dr. Dolan's recommendation that Plaintiff's condition be reassessed the following day.  Instead, the Dean warned Plaintiff: "If you do not take the exam tomorrow as currently scheduled, you will receive an F in the course. And the same is true for all other work."

72.     On May 3, 2013, at 9:00 a.m., Plaintiff took her Constitutional Law exam, as directed.

73.     Over the course of six (6) hours, Plaintiff struggled to complete her exam while rushing to and from the restroom with repeated bouts of severe vomiting and diarrhea. She also labored to work through the overwhelming sedating effects of multiple prescription medications.

74.     Plaintiff ultimately received a grade of C+ on her Constitutional Law exam, the lowest grade she had ever received on any final exam at any school during her education.

75.     Early in May of 2013, the Dean and/or another Law School representative contacted Dr. Flavio Arana ("Dr. Arana") at Meridian Psychiatric Partners, LLC ("Meridian Psychiatric Partners"). Meridian Psychiatric Partners is the private psychiatric practice where Plaintiff had sought treatment for depression and anxiety.

76.     The Dean and/or another Law School representative informed Dr. Arana (who was filling in for Plaintiff's long-standing psychiatrist, Dr. Elise Rehn ("Dr. Rehn") during Dr. Rehn's maternity leave) that Plaintiff was not completing work; that Plaintiff was attributing her failure to finish work to her depression; and that Plaintiff had had an emergency appointment with the University's Counseling Office.

77.     Plaintiff had not signed a release permitting anyone from the Law School to speak with her private psychiatrist during this time frame. Plaintiff had not authorized this conversation.

78.     On May 13, 2013, the Dean sent Plaintiff an email demanding that she meet with him and other individuals and that Plaintiff bring to this meeting "all the documents you have related to your hospitalizations during the Spring 2013 semester (documents can include bills, medical reports, etc.)." The Dean also demanded that Plaintiff bring "all documents related to your computer failure during the Spring 2013 semester (same thing, bills, invoices, etc.)."

11

79.     The Dean's reference to "hospitalizations during the Spring 2013 semester" denoted a period two months prior in early March of 2013 during which Plaintiff had experienced medical complications caused by her endometriosis and had sought medical treatment at Northwestern Memorial Hospital Emergency Department.

80.     While undergoing medical treatment in March of 2013, Plaintiff had requested a short extension on a paper from Professor James McMasters.  Following Law School protocol, Plaintiff had promptly notified Professor McMasters about her medical condition. Professor McMasters had granted Plaintiff a brief extension.

81.     When Plaintiff requested an extension on her paper in March of 2013, Professor McMasters had consulted with the Dean about Plaintiff's request.  At that time, the Dean had not opposed the extension or required medical documentation or access to Plaintiff's treating physicians.

82.     In response to the Dean's May 13th request to meet and to produce extensive documentation related to her health (and computer failure), Plaintiff respectfully asked the Dean to provide some context as to the purpose of the meeting and how the requested documents would be involved.

83.     The Dean replied to Plaintiff's request with a single-sentence email: "That is the context for our discussion."

84.     On May 16, 2013, the Dean again contacted NMFF to discuss Plaintiff's medical diagnosis and symptoms (although by that time, Plaintiff no longer had any pending requests for postponement of exams or papers).

85. In the meantime, Plaintiff completed another exam and three final papers for four of her classes. The Dean had given Plaintiff a deadline of May 20, 2013 at 5:00 p.m. for submitting those papers.

86. Plaintiff emailed all her professors at approximately 4:30 p.m. on May 20th to notify them that, although she had completed her papers, she was unavoidably detained, and would not be able to access her computer (on which her exams were saved) to send them until slightly after 5:00 p.m. that day.

87. Plaintiff proposed to her professors that she email her papers to them as soon as she returned home and regained access to her computer. In keeping with standard Law School practices and procedures, Plaintiff volunteered to provide evidence, including systems-generated timestamps that would conclusively demonstrate that her papers had not been modified after the deadline.

88. Plaintiff's professors willingly agreed. However, shortly thereafter, they directed Plaintiff to refrain from sending her completed papers. On information and belief, Plaintiff's professors were instructed by the Dean to refuse her papers.

89. Late that same night, the Dean emailed Plaintiff and directed her to submit her papers directly to him by 5:00 p.m. the next day.

90. By the time Plaintiff read the Dean's email from the night of May 20, 2013, his "next day" deadline had lapsed.

91. The Dean sent a follow-up email on May 23, 2013, declaring that he was giving Plaintiff "F" grades in all three courses. The Dean subsequently entered "F" grades for Plaintiff in all three of her courses.

92.   The Dean stated that the "F" grades would remain on Plaintiff's transcript until she had submitted her computer for forensic examination by the Northwestern IT department.

93.   Immediately upon receipt of the Dean's email, Plaintiff offered to make her computer available for forensic examination by the University to confirm that she had not altered her papers after the deadline.

94.   At this point, the Dean deviated from his original terms and conditions and refused to permit a forensic examination of Plaintiff's computer until she had provided him with all documents relating to her hospitalization back in March of 2013.

95.   The Dean reiterated that Plaintiff's transcript would reflect "F" grades for all three courses and that none of her professors would be permitted to grade her papers unless Plaintiff produced the sought-after medical records.

96.   The Dean also imposed an indefinite "enrollment hold" on Plaintiff's registration at the Law School. This hold prevented Plaintiff from enrolling in courses. The Dean further effectively prevented Plaintiff from engaging in other academic activities, including the annual writing competition for law journal membership.

97.   Plaintiff, through an attorney, tried to resolve the conflict. Counsel for the University responded that Plaintiff's only recourse was to meet with the Dean and provide him with the materials he had demanded.

98.   On May 30, 2013, Plaintiff was awarded a scholarship (bestowed upon only 3 of approximately 140 summer legal interns) from the USAO. Because Law School rules preclude students from simultaneously receiving scholarship funding and course credit for the same internship, Plaintiff promptly notified her professor that she would need to withdraw from her

Summer Public Interest Practicum course.  Her professor permitted Plaintiff to withdraw without incurring any marks or notations on her transcript.

99.     On June 14, 2013, the Dean informed Plaintiff that he had added a "W" grade to her transcript because she had withdrawn from the Summer Public Interest Practicum course. This decision deviated from standard Law School practice.

100.    A "W" on a transcript denotes that a student has withdrawn from a course after the "drop" deadline.  Most often this occurs when a student is failing the course.

101.    The Dean later informed Plaintiff that he had imposed the "W" grade on her transcript in order to pressure her into meeting and producing her medical records.

102.    Feeling that she was being coerced by the Dean's interference with her transcript into providing him with private medical records pertaining to her gynecological health, Plaintiff sought the support and advice of others at the University and Law School.

103.    In June of 2013, desperate for help, Plaintiff attempted to engage the foremost Dean of the Law School, Daniel Rodriguez, in her dispute with the Dean.  Because Dean Rodriguez was traveling abroad, she implored his administrative assistant to ask him to contact her.

104.    Before responding to Plaintiff, Dean Rodriguez spoke to Dean Zimmerman. Dean Rodriguez then sent Plaintiff an email from Europe, advising her, "it would not be appropriate" for him to discuss this matter with her because Dean Zimmerman "is the correct venue for the concerns that you have."  He instructed her to "act quickly and cooperatively in meeting with Dean Zimmerman."

105.    Plaintiff then sought assistance from the larger University community, including SSD staff members, Tim Montgomery and Margie Roe.  Ms. Roe and Mr. Montgomery brought

the issue to the attention of Todd Adams, Dean of Students at the University, specifically

advising him that the stress of Plaintiff's conflict with the Dean was taking a physical toll on

Plaintiff.

106.    Dean Adams declined to communicate with Plaintiff and failed to provide her

with any guidance or to intervene to affect a resolution.

107.    Subsequently, the Dean (Zimmerman) sent Plaintiff an email advising her to stop

seeking counsel from others in the University.

108.    Dean Rodriguez, characterizing Plaintiff's dispute with the Dean an "internal Law

School issue," directed her to refrain from including Dean Adams on any correspondence "as

this does not help at all in moving this process forward."

109.    Plaintiff was thwarted in her attempts to informally resolve this dispute.

110.    During June and July of 2013, Plaintiff was offered numerous opportunities to

interview with various law firms for summer associate positions.

111.    However, the "F" and "W" grades on Plaintiff's transcript rendered it impossible

for her to move forward in the interview process.

112.    Under extreme pressure and in an effort to mitigate the damage inflicted by the

Dean, Plaintiff agreed to meet with the Dean and produce the requested medical and computer

records for inspection.

113.    Trying to clarify the breadth of the Dean's request, Plaintiff wrote to him that she

intended to bring to the meeting "copies of my medical records from spring 2013, which will

include information pertaining to my colonoscopy, endoscopy, sigmoidoscopy, biopsy,

ultrasounds and other procedures involving the examination of my small intestine, large

intestine, rectum, stomach, uterus, ovaries, fallopian tubes and other parts of the interior cavity of my body."

114.    The Dean replied: "See you Monday at 2:00 pm."

115.    Plaintiff took several days off from her internship with the USAO to fly back to Chicago to meet with the Dean on July 15th and 16th of 2013 ("July Meetings").

116.    Wary and anxious about meeting alone with the Dean, Plaintiff requested to have legal counsel accompany her during the meetings.

117.    The Dean denied her request.

118.    Plaintiff requested that she be allowed to have a representative from the University's SSD office with her during the meetings.

119.    The Dean denied her request.

120.    Given that she was being compelled to attend the meeting alone, Plaintiff asked to record the meetings.

121.    The Dean denied her request.

122.    Plaintiff's meetings with the Dean (and Professor Maureen Stratton, whom the Dean had invited) lasted over six (6) hours and stretched over two (2) days.

123.    Plaintiff was subjected to intense interrogation by the Dean during the July Meetings.

124.    During the July Meetings, the Dean demanded confidential and irrelevant information from Plaintiff.  For example, the Dean asked Plaintiff whether she had ever been diagnosed with depression.

125.    The Dean demanded that Plaintiff explain why she had missed appointments with her psychiatrist at Meridian Psychiatric Partners (an assertion that was not true), thereby

intimating that he was somehow privy to unreported information about her mental health treatment.

126.    In the course of the July Meetings, the Dean showed Plaintiff a document from the University's SSD office that contained confidential disability information, protected by the Family Educational Rights and Privacy Act, about one of Plaintiff's classmates.

127.    The Dean informed Plaintiff that he was a contributing member of a group email list, comprised of deans from all the "top law schools," and insinuated that he had the ability to prevent Plaintiff from being accepted at another law school, were she to try to transfer.

128.    During the July Meetings, and in response to the Dean's requirement that she provide "all documents relating to [her] hospitalization in the spring of 2013," Plaintiff showed the Dean seventeen (17) pages of medical records, including detailed reports and images from her gynecological and gastrointestinal examinations in early March of 2013.

129.    The Dean and Professor Stratton reviewed these records in Plaintiff's presence. The Dean declared that the records were not to his satisfaction.

130.    Nonetheless, the Dean insisted upon keeping Plaintiff's medical records for further inspection.

131.    On information and belief, Plaintiff's hospital records remain in the Dean's possession to this day.

132.    During the July Meetings, Plaintiff also provided the Dean with a copy of the confirmation receipts from the Apple Store for the repairs made to her computer.

133.    Finally, Plaintiff permitted the Law School IT staff to examine her computer for the limited purpose of ascertaining the systems-generated timestamps on the three papers that she had completed but had not been permitted to submit on May 20th.

134.    Before the inspection commenced, Plaintiff showed the Dean and the Law School IT staff that all three papers were stored in a separate, single, and clearly labeled folder on Plaintiff's computer desktop.

135.    The Dean supervised this inspection.

136.    Upon inspection, the timestamps associated with each file evidenced that the papers had not been modified after the deadline.

137.    In the course of the meeting on July 16th, the Northwestern Law IT technician used Spotlight© (a built-in Apple® search tool) to conduct a global search of items and files (including private, personal emails, phone text messages, government documents related to Plaintiff's work at the USAO, and correspondence between Plaintiff and her legal counsel) stored on Plaintiff's personal computer.

138.    Plaintiff had not authorized a global search of all files and items stored on her computer. She directed the IT technician to cease his examination of her computer.

139.    The Dean demanded that Plaintiff reveal the policies, provisions, and protocols used by the USAO to control, monitor, and authorize access to files stored on its computer network.

140.    The Dean insisted that Plaintiff allow Northwestern Law's IT staff to contact the USAO's IT department and, in fact, ordered Plaintiff to telephone the USAO in his presence during the meeting.

141.    Cowered by the Dean's demand, Plaintiff phoned the USAO IT department, but no one answered.

142.    Following the July Meetings, the Dean removed the "W" grade from Plaintiff's transcript and permitted some of her papers to be graded by her professors.

143.    To this day, however, Plaintiff has not received a professor-issued grade in at least two of her courses.

144.    The Dean refused to remove the "F" grade in her Conflict Management course.

145.    The Dean refused to remove the "hold" on her enrollment.

146.    Finding it impossible to interview for summer associate positions with these damaging marks on her transcript and a "hold" on her enrollment, Plaintiff requested a Leave of Absence ("LOA") from the Law School.

147.    On August 9, 2013, Plaintiff wrote the Dean, requesting permission to take a LOA.  She also informed the Dean that she would be filing a formal grievance with the University.

148.    On August 12, 2013, the Dean responded in an email and stated that in order for her to return from a LOA, Plaintiff would need to comply with the following "academic conditions":

   i.    Plaintiff must submit hospital records that would substantiate her over night stay in the hospital on March 3-5th and March 6th and 7th of 2013;

  ii.    Plaintiff must produce documents to verify that her computer crashed on April 1st and April 25th of 2013;

 iii.    Plaintiff must permit the IT department at the Law School to speak directly with the USAO to clarify its encryption practices.

149.    In his email of August 12th, the Dean, for the first time, suggested that Plaintiff need not have shared with him all the detailed medical records, test results and images that she had produced to him during the July Meetings.  Instead, the Dean claimed that all he required of

Plaintiff was written substantiation that she had stayed over-night in the hospital on March 3-5[th] and March 6th and 7th of 2013.

150. The Dean further implied in his August 12th email that he would not attest to Plaintiff's good character and fitness on her bar application.

151. Finally, the Dean accused Plaintiff of violating sections 5(b) and 7 of the University Code of Conduct.

152. The University Code of Conduct section 5(b) prohibits students from "[k]nowingly furnishing false information to the University or any University official." Section 7 of the University Code of Conduct prohibits "[f]ailure to … cooperate with University officials."

153. This was not the first time that the Dean had threatened to bring charges against Plaintiff for violating the University and Law School Codes of Conduct. Beginning in April of 2013, the Dean warned Plaintiff that he would instigate formal charges of academic dishonesty against her.

154. However, although more than a year has elapsed since these threats began, the Dean has failed to bring any type of charge against Plaintiff.

155. In late August of 2013, Plaintiff attempted to schedule an appointment with her private psychiatrist, Dr. Rehn (from Meridian Psychiatric Partners) who had just returned from maternity leave.

156. Dr. Rehn declined to schedule an appointment with Plaintiff and, instead, informed Plaintiff in a short voicemail message, that she had terminated their physician-patient relationship. Per the instruction of her primary care physician, Plaintiff again contacted Dr. Rehn to request adequate notice and time to find a new provider before termination of care.

21

Nevertheless, Dr. Rehn refused to communicate with Plaintiff, abruptly abandoning her without psychiatric care and access to continued pharmaceutical management.

157.    On information and belief, Dr. Rehn terminated the physician-patient relationship with Plaintiff because her supervisor, Dr. Arana, had been advised by the Law School that Plaintiff was manipulating her professional care team to procure extensions on Law School assignments and exams.

158.    On August 22, 2013, Plaintiff completed, signed and submitted her LOA form. Plaintiff characterized the reason for her leave as "Other" (not "Medical" and not "Personal") and appended a document explaining the basis for her leave. (See Plaintiff's LOA Request Form, Exhibit C.)

159.    In the meantime, even though Plaintiff had already provided the Dean with hospital records that collectively evidenced her presence in Northwestern Memorial Hospital Emergency Room on the dates in question, Plaintiff returned to the records departments at the hospital on at least four occasions, seeking patient records that would further confirm the dates on which she had been in the Emergency Room in March.

160.    The hospital provided Plaintiff with dated records documenting that she was in fact in the Emergency Room on the March dates that she had told Professor McMasters.

161.    Plaintiff had these hospital records delivered via Federal Express to the Dean on August 22, 2013.

162.    Plaintiff also delivered to the Dean at this time, three (3) Apple® Store Genius Bar Records documenting her computer difficulties on March 29th and April 24-25[th] of 2013.

22

163.    On August 26, 2013, the Dean informed Plaintiff that the documents she had submitted from Northwestern Memorial Hospital Emergency Department did "not look like one that [he had] seen before from the Emergency Department."

164.    The Dean ordered Plaintiff to provide him with the name and contact information for hospital personnel who could verify the documents and sign a medical release that would allow him to speak directly with such person(s).

165.    Plaintiff declined to allow the Dean unfettered access to her medical professionals.

166.    On September 6, 2013, Plaintiff filed a grievance with the Office of Equal Opportunity Access  ("OEOA") of Northwestern University.

167.    The Director of the OEOA is designated as the Section 504 Coordinator and is charged with ensuring University compliance with the non-discriminatory requirements of Section 504, the ADA, and applicable federal and state regulations.

168.    In her grievance complaint, Plaintiff alleged that the Dean had discriminated against her and harassed her on the basis of her disability (in violation of Section 504 and the ADA) and on the basis of her gender (in violation of Title IX).

169.    Plaintiff also alleged that the Dean had failed to follow University and Law School rules and procedures.

170.    Shortly after Plaintiff filed her grievance, but one month after she had submitted her LOA form, the Dean "completed" the Plaintiff's signed LOA form.

171.    The Dean modified the original LOA form to which Plaintiff had already applied her signature by crossing out Plaintiff's description of the reason for her leave.

172.    The Dean also removed the attachment that Plaintiff had submitted with her LOA form and appended to it his own attachment imposing "Academic Conditions" for return.

173.    The supposed "academic" conditions were:

    i.    Plaintiff must sign a release authorizing the Dean to speak with Northwestern Memorial Hospital personnel who could verify the Emergency Room discharge papers that Plaintiff had tendered previously;

    ii.    Plaintiff must provide still more documentation of her computer failure in April of 2013; and

    iii.    Plaintiff must permit the Law School IT department to speak with the USAO's IT department concerning the USAO's encryption practices.

174.    The Dean noted in his addendum to Plaintiff's Request for a LOA that the Law School "reserves the right to utilize University and/or Law School processes with respect to any possible violations of the University Code of Student Conduct or the Law School Honor Code, including but not limited to concerns about failure to cooperate and dishonesty." (See Dean's Revision to LOA Form, Exhibit D.)

175.    The University's Student Handbook (see Exhibit E) requires that in all cases involving allegations of a violation of academic integrity, the student suspected shall at a minimum, be accorded the right to (1) a prompt investigation; (2) reasonable written notice of the violation; (3) reasonable written notice of the procedure involved; (4) a hearing by a neutral decision maker at which the student may be heard, and (5) the right to appeal.  Implementation of any sanctions is to be suspended until all appeals have been exhausted.

176.    To this day, the Dean has never filed charges against Plaintiff for a violation of academic integrity.

177.    The accusations made by the Dean against the Plaintiff have never been investigated by the University.

178.    The Plaintiff has never received written notice of suspected violations.

179.    A hearing has never been conducted to determine whether the Plaintiff has committed a violation of the University Code of Conduct.

180.    Despite this lack of due (or any) process, the Dean has unilaterally imposed the most severe sanctions upon Plaintiff.

181.    In fall of 2013, pursuant to her grievance complaint, the Northwestern OEOA interviewed Plaintiff at length.  Plaintiff submitted a list of potential witnesses to support her case.

182.    In late November of 2013, Plaintiff, still awaiting adjudication of her OEOA complaint, notified the Dean of her intent to return from her LOA.

183.    The Dean denied Plaintiff's request to return from her LOA.  In so doing, the Dean reiterated that Plaintiff had not complied with his "academic conditions".

184.    The Dean also stated that Plaintiff's LOA was "medical" at least in part.  In actuality, however, Plaintiff had not checked the box labeled "medical" on the LOA form and had specifically disavowed that there was a medical basis for her LOA.

185.    Nonetheless, the Dean stated that, as a pre-condition for her return, Plaintiff must obtain "medical clearance" from her treating medical professionals.

186.    He further instructed her that "[w]homever evaluates you for medical fitness to return to your studies will need to evaluate you, determine if you need to meet with any other medical professionals to complete medical clearance and share their conclusion with me (you

will need to sign a release for this)."  (See Dean's Response to Request to Return from LOA, Exhibit F.)

187.    Unable to satisfy the Dean's insurmountable and inappropriate conditions, Plaintiff continued on indefinite leave, effectively expelled from the Law School.

188.    The Northwestern OEOA grievance procedures provide that "[i]nvestigations will be conducted as expeditiously as possible and are usually completed within 30-60 days, though this may vary based on the availability of witnesses, the scope of investigation, or unforeseen circumstances."

189.    At the time that Plaintiff filed her original complaint in this lawsuit, more than nine (9) months (roughly 297 days) had gone by since Plaintiff filed her Northwestern OEOA grievance and the OEOA had not issued a finding.

190.    On August 13, 2014, more than eleven (11) months after Plaintiff filed her grievance and approximately six (6) weeks after Plaintiff filed her complaint in federal court, the OEOA issued a decision.  In a 2-1/2 page decision, the OEOA concluded that Dean Zimmerman had not violated the Northwestern University policy on discrimination and harassment.

191.    As of mid-June 2014, Plaintiff had borrowed over $175,000 in federal student loans to cover expenses related to her education at the Law School.  She accrues over $1000.00 per month in interest on these loans.

192.    The time period during which Plaintiff was able to defer payment of her student loans lapsed in March of 2014.

193.    Lacking funds to repay her student loans, Plaintiff applied for and was granted a temporary loan forbearance that began on March 29, 2014 and was to end on September 26,

2014. Plaintiff was required to begin repayment of her student loans on September 27, 2014, but applied for and was able to procure an additional extension.

194.    During this forbearance period, the interest on Plaintiff's student loans will continue to accrue and capitalize. Plaintiff's request for loan forbearance may limit her ability to qualify for additional forbearance or for other loans in the future.

195.    All of Plaintiff's work experiences over the last seven years have been in the legal field. As a result of Defendants' malfeasance and nonfeasance, Plaintiff was not able to secure employment, legal or otherwise for some time.

196.    Due to the uncertainty of Plaintiff's status as a student of the Law School and the current state of her transcript, it is futile for Plaintiff to apply to another law school of similar caliber. The harm caused by Defendants is irreparable and can only be mitigated by expunging all negative materials from Plaintiff's student record and facilitating Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation.

197.    Lacking funds to continue to support herself, Plaintiff relinquished her apartment in Chicago and moved back to California, where she has been living with her parents in their rental apartment and relying on their financial support. In the fall of 2014, Plaintiff obtained a clerical position to help offset some of her expenses.

198.    Plaintiff's parents are 60 years old, have no significant assets, savings or retirement funds and earn less than $28,000 in yearly income.

199.    Plaintiff has used all credit available on her credit cards and has had to apply for additional cards in order to cover basic living expenses.

200.    Plaintiff has had to reduce the scope and quality of her health treatment in order to reduce her medical costs.  Plaintiff was not permitted to renew her student health insurance when it expired in August of 2014 unless she agreed to label her leave of absence as a medical leave.

201.    In January of 2015, Plaintiff requested to withdraw from Northwestern University School of Law.  Plaintiff requested to withdraw because of the on-going litigation with Northwestern University and because withdrawal from the Law School was necessary so that she could pursue other opportunities.  The University processed her withdrawal.

202.    Plaintiff relied on weekly therapy sessions with a cognitive behavioral therapist in order to manage her relentless stress until approximately September of 2014, at which point she lost her student health insurance and could no longer afford these sessions.  More recently, because she can now access private insurance through the Affordable Care Act, Plaintiff is endeavoring to resume therapy.  Plaintiff also takes daily pain medication, including oral medication, vaginal suppositories, and pelvic floor therapy to control the pain triggered by the endometriosis.

203.    Plaintiff experiences severe anxiety and chronic insomnia due to her (and her family's) financial hardship, as well as her lack of employment and educational prospects. Plaintiff's anxiety and insomnia have exacerbated the pelvic and abdominal pain caused by her endometriosis.  Defendants, each of them, have wrongfully caused this emotional distress and physical injury, and have deprived Plaintiff of the opportunity to obtain her juris doctorate and further her legal degree as described above.